OPINION OF THE COURT
Kathryn E. Freed, J.
Plaintiffs seek a declaratory judgment and move for a preliminary injunction, enjoining defendants from enforcing section 3-719 (2) (b) of the Administrative Code of the City of New York, which purports to extend the voluntary contribution limits and restrictions applicable to candidates who have elected to receive public matching funds pursuant to the New York City Campaign Finance Act, to “non-participating” candidates who are therefore, ineligible for those public matching funds.
Defendants cross-move pursuant to section 3211 (a) (7) of the Civil Practice Law and Rules to dismiss the verified complaint on the grounds that it fails to state a cause of action. Additionally, the Attorney General of the State of New York (hereinafter AG) moves for leave to file and argue a brief in the capacity of “amicus curiae” in opposition to plaintiffs’ motion and in support of defendants’ cross motion to dismiss.
Plaintiff George McDonald (plaintiff) is a candidate for the office of mayor in the 2013 elections for the City of New York. Plaintiff McDonald 2013 is the political committee that George McDonald has authorized to receive contributions and make expenditures for him in the aforementioned 2013 elections, both primary and general. Defendant City of New York (the City) is a *828 municipal corporation pursuant to the laws of the State of New York. Defendant New York City Campaign Finance Board (CFB), is the agency of the City that administers the Campaign Finance Act (CFA).
Oral argument in the within matter was heard before this court on February 25, 2013. It should be noted that the AG’s motion to proceed in the capacity of amicus curiae was granted on consent at that time. It should also be noted that in rendering the instant written decision, the court finds it both instructive and necessary to explore the legislative history relevant to this case.
State Legislative History
The legislature enacted the first iteration of what is now article 14 of the Election Law in the New York State Campaigns, Elections and Procedure Law of 1974. That law set forth a regulatory scheme for campaign expenditure limits, reporting requirements and restricted contribution limits applicable to all primary, general and special elections for state and local public offices held in the State of New York. Additionally, it established the State Board of Elections to administer and enforce these laws.
Election Law § 479, as added by Laws of 1974, chapter 604, § 1, specifically addressed contribution limits. This section was subsequently repealed and later reenacted in the Laws of 1976, chapter 577. The language of section 479, as passed in 1976, is now reflected in the language of section 14-114 of the current Election Law, although it has undergone substantial legislative changes.
In 1992, the state legislature passed the “Election Reform Act of 1992” (L 1992, ch 79), which amended areas of the Election Law that related to ballot access, the political calendar, voter registration, contribution limits and other election issues. Section 14-114 was also amended. The previous formula for contributions sometimes allowed for large contributions for both statewide elections and also for New York City citywide offices. The legislature amended section 14-114, setting a ceiling on contribution limits to $12,000 in primaries and $25,000 in general elections for statewide offices, and also the New York City positions of mayor, comptroller and city council president (now public advocate).
The current section 14-114 sets contribution and receipt limitations on candidates for all nominations and elections for pub- *829 lie offices. These limitations vary pursuant to formulas calibrated on the basis of party enrollment in primary elections and on voter registration for general elections. It should be noted that no special ceilings were set for either New York City Council or borough president elections, other than the general statewide restrictions of $50,000 for public offices, or a lesser amount based on the number of voters for said election multiplied by $.05.
Other calculations depend on whether the contributor is a close relative of the candidate. Additionally, contribution limitations, both máximums and mínimums, are imposed for state and local elections, including State Senate and State Assembly. Recalculations are required quadrennially based on the cost of living (see Election Law § 14-114 [1] [a], [b], [c]). Funds of the candidate and the candidate’s spouse spent on the campaign are not considered contributions and thus are not subject to contribution limits (see Election Law §§ 14-100 [9] [3]; 14-114 [8]).
City Legislative History
In 1988, the New York City Council first established a system of public financing for city elections, known as the City’s “Campaign Finance Act.” Said act was adopted as Local Law No. 8 (1988) of City of New York and codified at Administrative Code § 3-701 et seq. The CFA set up a voluntary system whereby participating candidates agreed to limit contributions from individual contributors in return for which they would receive matching public funds. Additionally, candidates agreed to file various information concerning those contributors with the CFB. This act matched dollar for dollar the first $1,000 for participating candidates. However, it did not impose limits on nonparticipating candidates.
The CFA has undergone several subsequent amendments. In 1998, participating candidates were prohibited from accepting contributions from corporations (see Administrative Code § 3-703 [1] [1]). In 2004, the City Council passed Local Law No. 60 which, for the first time, directed nonparticipating candidates to abide by the same contribution limitations as those imposed on participating candidates, pursuant to Administrative Code § 3-703 (1) (f). Additionally, the Council extended the prohibition against corporate contributions to nonparticipating candidates (see Administrative Code § 3-703 [1] [1]).
In 2007, the Council extended the prohibition on contributions to include limited liability companies and partnerships, and imposed reduced limitations on contributors “doing busi *830 ness with the city” (see Local Laws Nos. 34, 67 [2007] of City of NY). These restrictions were extended to also include nonparticipating candidates (see Administrative Code § 3-719 [2] [b]). The current contribution limits for both primary and general elections combined, per contributor, are $4,950 for mayor, public advocate or comptroller, $3,850 for borough president and $2,750 for council members. Currently, participating candidates receive public funds at a six-to-one matching rate for the first $175 per allowable contributor.
Position of the Parties Plaintiffs Position
Plaintiff acknowledges that the City can set limits on contributions on publically funded candidates, since said candidates have agreed to such limitations in exchange for receiving public funds. However, he argues that the City cannot set limitations on contributions for nonparticipating candidates who have not agreed to any such limitations, and who are governed solely by Election Law article 14, which preempts the City’s contribution limitations.
Plaintiff argues (and it is generally accepted law) that the State can indicate its intent to preempt an area of law either by express statutory language, thereby clearly indicating that it has preempted the field, or by implication. In the instant matter, both sides agree that no specific preemption language is involved. However, preemption can be inferred, if the State establishes a “comprehensive and detailed regulatory scheme” (DJL Rest. Corp. v City of New York, 96 NY2d 91, 95 [2001]; see also Consolidated Edison Co. of N.Y. v Town of Red Hook, 60 NY2d 99, 105 [1983]). Plaintiff argues that such preemption must be found to exist in the instant case because article 14 “sets forth such a comprehensive and detailed regulatory scheme of mandatory contribution limits applicable in all primary, general and special elections for state and local public offices” (plaintiffs mem of law at 5).
Proof of such details include the fact that article 14 contribution limits are calibrated according to the number of party enrollees in primary elections, and voter registration in general elections, with different formula utilized, depending on statewide and non-statewide elections (see Election Law § 14-114). Article 14 established numerous categories of contributors and contained specific exemptions for certain transactions along with cumulative limitations. It also established detailed public disclosure with documentation and contribution form *831 requirements, and even specifically defined the term “contribution” (see Election Law §§ 14-100 — 14-130 [art 14]).
Plaintiff argues that this “well thought out scheme” indicates the State’s clear intention to continue to apply these limits to all candidates, absent a voluntarily acceptance of a more restrictive scheme as a trade-off for public funds. Plaintiff further argues that it cannot be disputed that by including such comprehensive language in article 14, the State absolutely intended to preempt the field.
The Election Reform Act of 1992, chapter 79 of the Laws of 1992, changed the previously existing formula for state and local elections by setting new floors and ceilings on contribution limits. It additionally authorized ongoing cost of living adjustments for future elections. The state formula was established so that the floors and ceilings would remain identical as automatic adjustments occurred over time. Plaintiff argues that it is particularly significant that in this act, the legislature set new limits on the New York City offices of mayor, public advocate, and comptroller, apart from other statewide offices, knowing that the City had already established different levels for publically financed candidates for these offices, thereby again evincing their intent to preempt local law.
Plaintiff asserts that initially the City acknowledged that its laws were subordinate to the laws of the State, and that city law was drafted with the specific intention of avoiding conflicts with the Election Law. “Nothing in this chapter shall be construed to prohibit the making or receipt of contributions to the extent permitted by the election law or to permit the making or receipt of contributions otherwise prohibited” (see Administrative Code § 3-714). Plaintiff also argues that the avoidance of conflict with the Election Law was a core legislative objective and quotes from Local Law No. 8 (1988) of City of New York § 1 (“Declaration of legislative intent and findings”):
“The council finds that this local law will supplement and be consistent with state law. The council does not intend by the enactment of this local law to prohibit any person from making or receiving any campaign contributions to the extent allowed by state law, or to permit any person to make or receive such contributions when prohibited by state law. Rather it intends, by means consistent with state law, to ensure an open and democratic political *832 system that inspires the confidence and participation of its citizens.”
Consistent with this goal, plaintiff notes that the City Charter, when establishing the CFB, specifically limited its authority and responsibilities to “any voluntary system of campaign finance reform established by local law” (see NY City Charter § 1052 [a] [5], [6], [7], [8], [10], [12], [13]). Plaintiff also argues that despite the fact that the City, in passing the original CFA, took pains to avoid conflict with the Election Law, it failed to do so when it passed Local Law No. 60 (2004) of City of New York. By extending restrictions to nonparticipating candidates, Local Law 60 is inconsistent with, and thereby in direct conflict with, article 14 of the Election Law. Therefore, it must be preempted. Plaintiff references the veto message of New York City Mayor Bloomberg to Local Law 60, wherein he stated that it would:
“seriously weaken the [New York City campaign finance] program’s legal basis. Since its inception in 1988, the program has depended for its salutary purpose on the voluntary participation of candidates
“[The law] would risk bringing the City’s program into conflict with Article 14 of the New York State Election Law, which establishes a comprehensive system for the mandatory regulation of campaigns . . . Neither the Legislature nor the 1988 Charter Revision Commission, which proposed the Charter provisions that ratified and authorized the current law, ever intended such a result . . . .”
Home rule provisions in the State Constitution and implementing legislation empower municipalities to adopt “local laws not inconsistent with the provisions of this constitution or any general law relating to” various policy areas (see NY Const, art IX, § 2 [c] [9]; see also Municipal Home Rule Law § 10 [1] [ii] [a] [1]-[12]). Therefore, it logically follows that any local laws passed pursuant to such home rule provisions would necessarily be subordinate to state law (see Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380 [2006]; Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372 [1989]; Matter of Lansdown Entertainment Corp. v New York City Dept. of Consumer Affairs, 74 NY2d 761 [1989]).
Plaintiff notes that such “inconsistencies” have been found where local law imposes additional restrictions over and above those imposed by the State, which invariably inhibit the opera *833 tion of the State’s regulations. Therefore, in Wholesale Laundry Bd. of Trade v City of New York (17 AD2d 327, 330 [1st Dept 1962], affd 12 NY2d 998 [1963]), a local law which would have raised the minimum wage, was struck down because it disallowed a lower wage rate than that allowed by the State. In that case, the Court found that the State had clearly fixed a minimum wage and, were it to be allowed to stand, local law would have superceded state law. Plaintiff argues that this case is analogous to the instant one, since the State allows higher contribution limits than the City for nonparticipating candidates.
Finally, plaintiff quotes sections of Local Law 60 to demonstrate that even in its drafting, the City, as with earlier laws, never intended to conflict with state law. Local Law 60 specifically states that in the event of any conflicts, the Election Law will prevail. Local Law 60 did not amend section 3-714 of the Administrative Code which directs: “[n]othing in this chapter shall be construed to prohibit the making or receipt of contributions to the extent permitted by the election law or to permit the making or receipt of contributions otherwise prohibited.” Therefore, prior to 2004, because the city limits only applied to participating candidates, no conflicts existed. However, after the enactment of the 2004 law, by extending the limits to nonparticipating candidates, the City brought its law into direct conflict with state law. Indeed, pursuant to its own provision, state law must prevail.
In further support of its argument, plaintiff references several informal opinions including one emanating from the AG, which states in pertinent part, “It is evident from the comprehensive nature of the Election Law that the State intended to occupy fully the area of campaign contribution limits, leaving no room for additional local regulation” (see 1995 Ops Atty Gen No. 95-46 [Sept. 22, 1995]).
Finally, plaintiff argues that the CFB is prohibited from enforcing any provisions of Local Law 60 on nonparticipating candidates, in direct contravention to Election Law article 14, which provisions include contribution limits, restrictions on types of contributors and additional reporting requirements. Plaintiff notes that in the past, courts have not permitted the CFB to impose legal obligations on candidates via the forms it requires candidates to complete. As support for his position, plaintiff refers to and relies on New York City Campaign Fin. Bd. v Ortiz (38 AD3d 75 [1st Dept 2006]), wherein the Appellate Division held that the CFB’s candidate certification form could *834 not be interpreted to extend personal liability to candidates for the repayment of public funds.
Defendants’ Positions
Defendant City argues that the passage of Local Law 60 and its subsequent amendments are a permissible exercise of local legislative authority pursuant to the State Constitution and the Municipal Home Rule Law. The City and the AG both agree that article 14 does not preempt Local Law 60. Both agree that Local Law 60 is not inconsistent with state law, or alternatively, the City argues that even if it is, it is the type of inconsistent local legislation that the courts have permitted to stand.
The AG agrees that the city local law is not preempted by state law. The AG argues that the City has taken itself out from under article 14 by constructing a system which allocates public funds for campaign financing. Therefore, the City cannot be preempted from establishing uniform campaign contribution limits for all candidates for the same offices.
The City emphasizes that plaintiff does not contest New York City’s power to enact legislation relating to campaign contributions and source restrictions, although the court notes that the actual paragraph of plaintiff’s quote refers exclusively to participating candidates. However, the City argues that this power emanates from New York’s Constitution, which provides in pertinent part that “every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government,” especially in reference to “powers, duties, qualifications, number, mode of selection and removal, [and] terms of office ... of its officers and employees” (NY Const, art IX, § 2 [c] [i], [ii] [1]). The Constitution also mandates that the “[r]ights, powers, privileges and immunities granted to local governments by this article shall be liberally construed” (id. § 3 [c]).
This constitutional grant of power to localities is promulgated by the Municipal Home Rule Law, which contains language that tracks article IX, §§ 2 (c) and 3 (c) (see Municipal Home Rule Law § 10 [1] [i], [ii]). The Municipal Home Rule Law additionally mandates that those areas granting such home rule provisions “shall be liberally construed” (Municipal Home Rule Law § 51). In consideration of this, the City argues that there is no legitimate basis for plaintiff to deny that the City is empowered to legislate its “mode of selection” for candidates to local offices. Thus, the remaining arguments against the city local law, *835 can only be that it is either so “inconsistent” with state law that it is in direct conflict with it, or that state law occupies that area of law so extensively that it has preempted the field. The City insists that neither scenario exists here.
The City initially argues that local law must be upheld because the Court of Appeals has determined that there is an “exceedingly strong presumption” that laws enacted by local legislatures are constitutional (see Lighthouse Shores v Town of Islip, 41 NY2d 7, 11 [1976]). In furtherance of that argument, the City references Matter of Resnick v County of Ulster (44 NY2d 279, 288 [1978]), wherein the Court of Appeals recognized the “deeply felt belief that local problems should, so long as they do not impinge on affairs of the people of the State as a whole, be solved locally” (see also Matter of Blaikie v Power, 19 AD2d 779 [1st Dept 1963], affd 13 NY2d 134 [1963]).
The City also argues that its law is not inconsistent with state law, and contends that plaintiffs reliance on Wholesale Laundry Bd. of Trade v City of New York (17 AD2d 327, 330 [1st Dept 1962], affd 12 NY2d 998 [1963]), is entirely misplaced. Plaintiff would interpret the holding in that case to stand for the proposition that a local law is in conflict with state law whenever it prohibits something that the State allows. The City argues that this interpretation is over-broad and “has been expressly and repeatedly rejected by the Court of Appeals over the years” (defendant’s mem of law at 24).
The City cites numerous cases to support its position, notably, People v Cook (34 NY2d 100 [1974]). In that case, New York City, pursuant to a state enabling statute, had passed a law that required retailers to pass along to their customers a tax imposed on cigarettes based on their nicotine content. The intent of the city law was to charge higher taxes on cigarettes containing higher levels of nicotine. Consequently, a retailer challenged the City arguing, inter alia, that because the state law had created a uniform system of taxes, the city law was in direct conflict with state law and must, therefore, be preempted. The Court found that Cook’s argument that a locality may not “enact a local law which prohibits conduct which is permitted by State law” was over-broad. That Court held, “[i]f this were the rule, the power of local governments to regulate would be illusory” (id. at 109; see also New York State Club Assn. v City of New York, 69 NY2d 211 [1987]; Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91 [1987]).
*836 The City argues that similarly in the instant matter, pursuant to
“the delegation to cities of legislative power in matters regarding the ‘mode of selection’ of local officers and in furtherance of the City’s interest in ensuring that local elections are free of both the fact and appearance of corruption, [the local law] should be upheld as having ‘substantial relation’ to that grant of authority under the Constitution and the MHRL” (defendants’ mem of law at 26).
The City also cites Jancyn for the proposition that, despite the fact that the City’s limitations on candidate contributions are more restrictive than the State’s, this fact alone does not necessarily compel a finding of conflict. In Jancyn, Suffolk County passed legislation that prohibited the sale of certain cesspool additives, without first obtaining approval from the County Commissioner. Six weeks later, pursuant to article 39 of the Environmental Conservation Law, the State also passed laws to regulate such additives.
Moreover, the State Department of Environmental Conservation approved an application by Jancyn to sell its additives. However, the County Commissioner of Suffolk County refused to approve their sale, prompting Jancyn to sue. It argued that the local law was inconsistent with state law by impermissibly prohibiting what the State clearly permitted. Therefore, the local law was required to be declared invalid since it was preempted by the state law. On appeal, the Court of Appeals disagreed and upheld the local law. The Court of Appeals first determined that there was no express language contained in the state statute which preempted the field. Next, the Court addressed the question of conflict with state laws, and held that just because “both State and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict” (id. at 97).
The City also cites Town of Clifton Park v C. P. Enters. (45 AD2d 96 [3d Dept 1974]), for the proposition that just because a local law differs from a state law does not necessarily mean it is inconsistent with state law. The Court therein stated
“[w]e do not perceive the use of the word ‘inconsistent’ to be the equivalent of ‘different’ . . . [T]o define the word ‘inconsistent’ narrowly as meaning merely ‘different’ would vitiate the flexibility of home rule as enunciated by the Legislature and the *837 executive branch in enacting the Municipal Home Rule Law . . . Rather, it is a check against local laws which would contradict or would be incompatible or inharmonious with the general laws of the State” (id. at 97-98).
The City argues that, as in the aforementioned cases, the local law at issue here is neither inconsistent nor incompatible with state law. Both laws limit political contributions and indicate that they were passed with the intent of diminishing both the actuality or appearance of corruption. Further, defendant contends that plaintiff has failed to demonstrate that “the Legislature sought to create a vested right to accept contributions up to the specified amount, rather than merely a limitation upon contributions” (defendants’ mem of law at 28). Defendant also argues that setting more stringent restrictions “cannot plausibly be construed as thwarting” the State’s legislative goal (id. at 29).
Defendant also contends that, regardless of how the two laws are compared, they are still harmonious, in that both have a common anti-corruption purpose. Additionally, defendant contends city law falls squarely within the powers mandated by the Municipal Home Rule Law, in that they are a mode of selection of local officers.
The City also argues that even if local law was to be found inconsistent, it would still not be preempted. The City cites Bareham v City of Rochester (246 NY 140 [1927]), wherein the Court of Appeals upheld the right of Rochester to drastically alter its procedure for selecting local officials, permitting it to elect local officers through non-partisan elections. The Court of Appeals specifically noted that local laws should not be inconsistent with the laws of the state, but nevertheless upheld this change, concluding that the mode of selection language
“connotes also that a municipality may define the precise method by which either an election or appointment shall be effected ...[,] that cities . . . are authorized to direct the manner by which their officers shall be enabled to assume their positions. According to the direction of [the] City Home Rule Law, we are impelled toward a liberal construction” (id. at 146-147).
This court finds this argument applicable to the instant matter. Defendant notes that, like Rochester, the City of New York may elect to follow a different pattern of selecting its local of *838 ficials “in furtherance of its own property, affairs and government, unless the Legislature has restricted the City from doing so in furtherance of a State concern” (defendants’ mem of law at 33). Defendants also assert that, as in Bareham, the law contemplates varying local selection patterns and does not prevent “local innovation” (defendants’ mem of law at 33). Hence, the City asserts that even if Local Law 60 is inconsistent, it is still not preempted.
Finally, the City argues that no evidence exists which establishes that the state legislature has preempted the field when it comes to contribution limitations on public elections. The City refers to and relies on the clear language of Election Law § 1-102, the applicability section of the Election Law, which provides, “[w]here a specific provision of law exists in any other law which is inconsistent with the provisions of this chapter, such provision shall apply unless a provision of this chapter specifies that such provision of this chapter shall apply notwithstanding any other provision of law.” Based on the above series of cases and the clear wording of section 1-102, and because Election Law § 14-114, by its express terms, does not contain language indicating that the State intended that it preempt the field, it therefore cannot preempt the city law (defendants’ mem of law at 36).
The AG urges this court to avoid taking a position on the issue of field preemption or on the specific impact of the wording of Election Law § 1-102, and its effect on local control of local elections. It argues that there is no need to rule on the entire question of preemption, because “there is no evidence of a legislative intent to preclude local laws that implement a locally funded public finance program for local elections, such as the local regulation at issue in this case.” (AG brief at 8.) The court agrees.
The AG argues that the proper inquiry of whether a local law should be preempted is to first, consider the intent of the state legislature in passing the state law, and then determine if the local law in question somehow frustrates the purpose behind said state law. The AG asserts that the question of intent is key in both the issues of “field preemption” and “conflict preemption” (AG brief at 9). Indeed, in attempting to construe legislative intent, one must first look at the legislative area involved. In doing this, local governments have been “accorded great autonomy” historically, as well as “room to experiment” (Matter of Resnick v County of Ulster, 44 NY2d 279, 286-287 [1978]).
*839 The AG also argues that the City’s passage of the public financing of public elections, and the commitment of city funds to advance that system, occurred as a result of a well considered policy judgment. Therefore, “it is reasonable to presume that the Legislature would intend to afford localities latitude to ensure that their expenditures of their own funds may serve their intended objectives” (AG brief at 9). Additionally, there is no evidence that the state legislature intended to prohibit local municipalities from imposing lower contribution limits as part of that local program of public funding. The AG agrees with the City that the fact that the State may legislate in a particular area does not mean that this automatically preempts that area of law, even if there are statements describing the state law as comprehensive (see Incorporated Vil. of Nyack v Daytop Vil., 78 NY2d 500, 507 [1991]).
As to the instant matter, although the State established a ceiling on contributions for some city offices, there is no indication that the State intended to create a system that entitled such candidates to affirmatively be entitled to receive contributions up to those levels. The AG notes the evolving city public finance system has continued to encourage the participation of smaller donors, by increasing the matching of public funds from the original one to one match for the first $1,000 to the current six to one match on the first $175. In this scheme, it is logical that the City would seek to limit the impact of large monetary contributions for all candidates.
Finally, the AG specifically notes that to the extent that the informal opinions emanating from its office, that plaintiff cites in his memo of law, stand for the proposition that state law would preempt contribution levels, other than those for participating candidates, it now disavows any such interpretation. (AG brief at 1.)
Reply Briefs
In his reply brief, plaintiff raises several new arguments in addition to his main argument that the City has failed to refute that Local Law 60, as set forth in section 3-719 (2) (b) of the Administrative Code, directly conflicts with and is also inconsistent with article 14 of the Election Law, and is thereby preempted.
Plaintiff now argues that not only is article 14 complete in its terms, but the 1974 predecessor to article 14 specifically stated that it was setting campaign limitations for all primary and general elections. Thus, it was clearly intended to be preemp *840 tive, in that “the provisions of this act shall be controlling” (see L 1974, ch 604, § 17). It is logical, therefore, to assume that article 14 was intended to do the same, and preempt all other attempts to limit campaign contributions. Plaintiff argues that the City originally interpreted state law as being preemptive and wrote the city law in such a way as to not be inconsistent with state law. Both New York City Local Law No. 8 and Administrative Code § 3-714 specifically state that nothing in the city act shall be interpreted “to prohibit the making or receipt of contributions to the extent permitted by the election law.” Plaintiff notes that section 3-714 was not repealed by either the 2004 or 2007 amendments to the Administrative Code.
The court finds the City’s argument to be more persuasive. The City refutes plaintiffs argument by noting that the state legislature expressly repealed all of the 1974 Election Law provisions. While it clearly elected to retain or reenact some language of the old Election Law with its 1976 changes, chapter 604, section 17 of the Laws of 1974 was one area it chose not to retain. Therefore, any reliance on that repealed predecessor to article 14 has no weight. Conversely, not only did the legislature specifically reenact section 1-102, it even chose to amend and extend its scope. The City argues that this evinces the legislature’s intent that section 1-102 should be accorded its plain meaning, in that if an inconsistent area of the law exists, then said inconsistent area will apply, absent specific language that the state law supercedes the inconsistent law.
Plaintiff further argues that the state law was originally structured in a way that insured that contribution limits were set high enough to allow candidates to raise amounts of money sufficient to reach all voters in a district, while also being competitive. Plaintiff argues that these amounts were calculated based on the number of voters to accomplish this end result. Additionally, he argues that “the Legislature contemplated that the funds needed to reach the applicable expenditure limit could be raised from as few as 10 non-family member contributors” (plaintiffs reply mem at 7).
Plaintiff also argues that low contribution limits are simply inconsistent with the state legislature’s purpose for setting higher limits. That legislative purpose can be inferred from the fact that in 1974, the State specifically considered, and ultimately rejected public funding, and instead, set the higher contribution limits. Plaintiff also argues that the legislature indicated that this remained its legislative intent, when in 1992, *841 it did not set differing limits for publically financed candidates, even though it was aware of the City’s separate limits on publically financed campaigns. Plaintiff argues that defendants are attempting “to reverse the choice the State Legislature made in 1992” (plaintiffs reply mem at 11).
The City opposes plaintiff’s contentions that the state legislature ever intended that large contribution limits from a small amount of donors were either better or mandated. It also, of course, denies that it is in any way attempting to reverse the state legislature’s choice.
Plaintiff raises additional “technical” arguments. First, he attempts to refute the City’s argument that Election Law § 1-102 preserves the City’s local law. He argues that section 1-102 has never been held to apply to campaign contributions and is superseded by the Administrative Code construction clause (§ 3-714), which mandates that the city law must defer to the Election Law. Secondly, he argues that Municipal Home Rule Law § 22 requires that any local law which is intended to amend or supercede sections of the state law must specifically indicate which sections of state law it affects. Thus, since the City has failed to specify those sections, its law must fail.
The City responds, and the court agrees, that while the Municipal Home Rule Law requires that local law be specific, the Municipal Home Rule Law adds that “failure so to specify [the section of state law] shall not affect the validity of such local law” (see Municipal Home Rule Law § 22 [1]). Hence, city law has not been invalidated. Plaintiffs final technical argument is that local laws enacted pursuant to the Municipal Home Rule Law would subject the CEA to a mandatory referendum. Suffice it to say that this argument has been addressed by the courts in prior matters, and the courts have-held that matters such as these do not change the term of elective office, but merely relate to it (see Matter of Golden v New York City Council, 305 AD2d 598 [2d Dept 2003], lv denied 100 NY2d 504 [2003]; Matter of Roth v Cuevas, 158 Misc 2d 238 [Sup Ct, NY County 1993]).
The Court’s Position
The court has carefully considered the contents of the oral argument and the papers presented. The Constitution of the State of New York (art IX, § 2 [c]) provides that every local government shall have the power to adopt and amend local laws not inconsistent with the provisions of said Constitution or any general law relating to its “property, affairs or government.” It especially refers to “powers, duties, qualifications, number, *842 mode of selection and removal [and] terms of office ... of its officers and employees” (NY Const, art IX, § 2 [c] [ii] [1]). This specific grant of power to localities is conferred via the Municipal Home Rule Law, in that its language tracks the constitution and specifically states that home rule provisions “shall be liberally construed” (Municipal Home Rule Law § 51). This specific language also mirrors the Constitution, which mandates the “Mights, powers, privileges and immunities granted to local governments by this article shall be liberally construed” (NY Const, art IX, § 3 [c]).
Indeed, the Court of Appeals has exhibited a reluctance to overturn local laws, finding that laws enacted by local legislatures have an “exceedingly strong presumption of constitutionality” (Lighthouse Shores v Town of Islip, 41 NY2d 7, 11 [1976]). In Lighthouse, the Court stated that as long as the local law is “reasonably related to some manifest evil,” which it is assumed that the municipality has investigated and felt the need to pass the local law, and if said law “justifies the disputed measure, this courts power of inquiry ends” (id. at 11-12). Moreover, the Court also held that plaintiff would bear a heavy “burden of showing that ‘no reasonable basis at all’ existed for the challenged portions of the ordinance” (id. at 12, quoting Matter of Van Berkel v Power, 16 NY2d 37, 40 [1965]; see also I. L. F.Y. Co. v Temporary State Hous. Rent Commn., 10 NY2d 263, 269 [1961], appeal dismissed 369 US 795 [1962]; Wiggins v Town of Somers, 4 NY2d 215, 218-219 [1958]; Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541 [1956]).
New York City Local Law No. 8, for the year 1988, or the CFA, is the predecessor legislation to Local Law No. 60 (2004), which is challenged in the instant proceeding. It was the first publically financed election law that New York City passed. Notable is the fact that Local Law 8 (§ 1) states that it is being passed because the Council has found that “special conditions have arisen in the city of New York, as a result of the presence of unique concentrations of wealth and financial power, which require special measures pertaining to ethics in government.”
It further states that the Council has determined that regulation of ethics in government is part of the property, affairs and government of the City of New York and that the enactment of this local law is within its legislative authority. The Council also stated that it intends to accomplish its goals by establishing a “voluntary system of public financing of local election campaigns ... to reduce improper influence on local officers by large cam *843 paign contributors and to enhance public confidence in local government.”
In the Declaration of Legislative Intent and Findings section of Local Law 60, the Council referenced its predecessor legislation and found that by its passage, it had successfully “enhanced] competition for elective municipal offices, limiting campaign contributions and expenditures to reasonable levels.” It then notes that the passage of Local Law 60 “will further the goals of this landmark legislation,” and “[b]y ending the disparity in contribution limits faced by participating candidates opposed by non-participating candidates, these amendments further reduce the opportunity for wealthy special interests to exercise or appear to exercise undue influence over local elected officials in New York City.”
The state law passed in 1992, known as the “Election Reform Act of 1992,” contains no such language or evidences such intent. It seems more concerned with decreasing the difficulty of ballot access, especially to non-incumbents. The General Purposes Clause of the Assembly Bill states that the reason for its passage is “[t]o facilitate ballot access for candidates, set the political calendar, enhance voter registration programs and set contribution limitations for nomination and election to public offices.” In Governor Mario Cuomo’s Approval Memorandum for this act, NY Senate Bill 7922, dated May 8, 1992, the Governor found the reason for its passage was the notorious hyper-technicality of New York’s Election Law, stating that “[i]t frustrates democracy and diminishes accountability. It sets traps for the unwary to protect the incumbent” (Governor’s Approval Mem, L 1992, ch 79, 1992 NY Legis Ann at 55).
While the Governor clearly expressed his frustration with the fact that the bill does not further limit campaign contributions, he acknowledged that it contained certain limits, even though he would have gone even further to curb the influence of wealth on elections (see id. at 56).
In New York State, it has long been accepted that preemption can be denoted in two ways: (1) either the State can explicitly state that it intends to preempt an area by the use of such language as “notwithstanding any other provision of law” or (2) it can, through its actions, signify that it has preempted an area.
In the instant case, it is not disputed that the State has not included specific preemption language in section 14-114. However, plaintiff asserts that courts have held that preemption *844 can be inferred where the State has set forth a “comprehensive and detailed regulatory scheme” (DJL Rest. Corp. v City of New York, 96 NY2d 91, 95 [2001]). Because article 14 promulgates such a detailed scheme of contributions for these positions, including a framework by which the contribution amounts can change over time, plaintiff argues that it is clear that the State intended to preempt this area. Therefore, plaintiff insists that the City cannot pass legislation that adds any additional contribution restrictions on its own public officials for these offices, except for those who have voluntarily accepted such lower limits in exchange for public financing. Plaintiff additionally cites to various cases that have held that local laws cannot either inhibit or place additional restrictions on state laws (see i.e. Wholesale Laundry Bd. of Trade, Inc. v City of New York).
For its part, the City argues the State has not preempted the area and that the city law is either not inconsistent or is the type of inconsistency that courts have regularly permitted.
This court believes that plaintiff addresses his arguments on preemption to too narrow a scope. He asks the court to find that additional restrictions on contributions for non-publically funded candidates for those local offices wherein the state legislature has specifically set a level of contributions, conflicts with state law and is, therefore, preempted. In fact, the court finds that the Election Law is silent on the issue of publically financed elections, and is not persuaded that such silence should be interpreted as a rejection of such restrictions.
Indeed, the court interprets all questions of preemption in light of the City having found it in the best interests of its citizens to have fashioned a publically financed system of contributions for local elections and the State’s silence in the face of that decision. The additional limitations for the purely local offices of mayor, comptroller and public advocate must be viewed as a vital part of the city public financing scheme as a whole.
The court finds that passing a public finance scheme, including restrictions on nonparticipating candidates is within the constitutional grant of local authority to the City over its property, affairs or government. As the court held in Roth v Cuevas (158 Misc 2d at 245), “if the phrase [‘property, affairs or government’] is to have any meaning at all there must be an area in which the municipalities may fully and freely exercise the rights bestowed on them by the People of this State in the Constitution.”
*845 Despite plaintiffs extensive and well reasoned argument, the court is not persuaded that Local Law 60 and its progeny are preempted by the Election Law. Nor is the court persuaded that Local Law 60 is inconsistent with state law.
The Court of Appeals, in a line of cases, has set forth a framework to assist in determining if a local law is inconsistent with a state law, and is therefore, preempted. In Jancyn Mfg. Corp. v County of Suffolk (71 NY2d at 97), the Court held that just because “both the State and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict.” Other indicia to look for is if the law is “inharmonious with the general laws of the State” (see Town of Clifton Park v C. P. Enters., 45 AD2d at 98); or if there is a “substantial relation to a legitimate, authorized purpose” (People v Cook, 34 NY2d at 108).
The question of what is or is not of local interest may have best been stated by the Court of Appeals in Baldwin v City of Buffalo (6 NY2d 168, 172 [1959]), “The theory behind home rule is very simple: it is the thought that local problems, in which the State has no concern, can best be handled locally.” Baldwin (at 174) also quotes an earlier decision on similar questions of legislation, “[l]et us recognize in our decision the useful division which custom and practice have made between those things which are considered State affairs, and those which are purely the affairs of cities” (see Adler v Deegan, 251 NY 467, 478 [1929], rearg denied 252 NY 574 [1929]).
Local Law 60 and its progeny clearly explained why it was necessary to pass additional legislation. Local Law 60 was passed after the City had almost 16 years to observe the success or failure of the original Campaign Finance Act. The City Council, after numerous council hearings, that were both testimonial and fact-finding in nature, made specific legislative findings and determined that additional limits on non-contributing candidates were necessary. The City realized that the original law had created a disparity which resulted in benefits accruing to nonparticipating candidates by affording them the easier task of raising higher amounts of money from both fewer contributors and additional sources. The Council found this disparity was frustrating the overall goal of eliminating the influence of wealth and special interests in local elections. As such, it was necessary to place uniform restrictions on all candidates. The City deemed that this was the best way to “further the goals of this landmark legislation” and to “further strengthen the *846 reform program that has been recognized as a national model” (Local Law 60 § 1). The court notes that the State conducted no similar investigation on the local impacts of the contribution limits it set for the offices of mayor, comptroller and public advocate.
New York is not the only jurisdiction that publically finances campaigns that found it necessary to impose uniform contribution limits on all candidates vying for the same positions, not just those accepting public financing. Other jurisdictions include Florida (Fla Stat § 106.08); Hawaii (Haw Rev Stat § 11-357); Maryland (Md Code, Elec Law § 13-226); Massachusetts (Mass Gen Laws ch 55, § 7A); Michigan (Mich Comp Laws § 169.252); Minnesota (Minn Stat § 10A.27); New Jersey (NJ Stat § 19:44A-11.3); and Rhode Island (RI Gen Laws § 17-25-10.1) (see AG’s brief at 6, 7 n 5).
The court finds several cases particularly instructive wherein the local laws were upheld in light of state laws which were passed to essentially cover that legislative area. In People v Judiz (38 NY2d 529 [1976]), the City of New York amended the Administrative Code to make it unlawful to sell, possess or use toy guns that resembled actual pistols or revolvers. The Penal Law also outlawed toy guns, but only where there was evidence of an intent to use the toy gun illegally. Plaintiff therein argued that the State had preempted the field with respect to the criminality of toy guns and that the applicable Administrative Code section was clearly unconstitutional. The Court of Appeals disagreed and upheld the local law as a “valid exercise of the police powers delegated to the city by the State Constitution and the Municipal Home Rule provisions” (id. at 531). The Court also noted that “while State law evinces an intent to cover, quite broadly, most of the possible categories . . . , the city ordinance is aimed at the prevention of a particular type of abuse. One does not depend on the other, nor are they inconsistent with one another” (id. at 532).
The Court of Appeals in Judiz also quoted its earlier decision in People v Cook (34 NY2d at 109), holding that “unless preemption is limited to situations where the intention is clearly to preclude the enactment of varying local laws, the power of local governments to regulate would be illusory” (38 NY2d at 532 [internal quotation marks omitted]). The Court also differentiated these decisions from a seemingly contradictory holding in *847 Wholesale Laundry Bd. of Trade v City of New York (17 AD2d at 328), stating,
“The mere fact that a local law may deal with some of the same matters touched upon by State law does not render the local law invalid. It is only when the State has evidenced a desire or design to occupy an entire field to the exclusion of local law that the city is powerless to act” (38 NY2d at 531-532 [citation omitted]; see also People v Webb, 78 Misc 2d 253 [Crim Ct, NY County 1974]).
This court also finds that the holding in Wholesale Laundry is of particular significance because plaintiff in the instant matter cited this case for the proposition that where localities impose additional restrictions on, or inhibit the operation of state laws, local laws are preempted. This court finds that, similar to the holding in Judiz, Local Law 60 and its progeny are “aimed at . . . a particular type of abuse” (38 NY2d at 532). State law legislates the same category but does not clearly preclude differing local laws (i.e., a publically financed campaign framework), that are passed to address a uniquely local abuse. One is neither dependent upon, nor inconsistent with the other.
The second case that the court finds instructive is Council For Owner Occupied Hous. v Koch (119 Misc 2d 241 [Sup Ct, NY County 1983]). In that case, the plaintiffs argued that a city local law which placed additional requirements on cooperative and condominium conversions (i.e., a reserve fund), set additional requirements on an area of law that was preempted by state law, especially since that law was passed to specifically regulate conversions within the City of New York. Like the instant matter, plaintiffs argued that the local law had to be struck down because it prohibited something that state law allowed. That court upheld the local law pursuant to article IX, § 2 (c) (ii) (10) of the State Constitution and the Municipal Home Rule Law, holding that the “local government has broad powers to enact legislation for the protection and welfare of persons and property” (id. at 245).
Although the local law might have been held to be inconsistent, the court noted that
“although it does impact on an area regulated by the State, [it] is an attempt to preserve the existing housing stock and to afford greater protection to tenants . . . Clearly this is a legitimate governmental concern and . . . [it] supplements the State *848 regulatory process and implicit therein is a recognition that additional government control is necessary” (id. at 245-246).
Similarly, in the instant case, the City Council has found that additional legislation is necessary to meet a purely local goal of reducing undue influence and increasing the public confidence and participation in local elections. Interestingly, in Council For Owner Occupied Hous., the City had asked the State to include in the legislation the requirement of a reserve fund, but the State chose not to do so. Plaintiffs therein argued that the State’s failure to pass such legislation indicated a rejection of that proposal by the state legislature. That court found that there was “no inference to be drawn from the failure ... to enact proposed legislation” (id. at 246).
Likewise, in the instant matter, the court finds that the state legislature’s refusal to pass publically funded elections does not mean that it meant to also reject public financing of local elections. Indeed, if anything, the court finds it to be an acknowledgment by the state legislature that a system of public campaign financing is merely another approach to electing public officers other than the one it chose to follow.
Finally, in New York State Club Assn. v City of New York (69 NY2d 211 [1987], affd 487 US 1 [1988]), the City adopted a local law (Local Law No. 63 [1984] of City of NY), which defined certain private clubs as having forfeited the “distinctly private” exemption that was granted under the City Human Rights Law. After extensive City Council hearings, the City determined that this legislation was necessary to prevent the discrimination it found to exist in certain private clubs. The City found that these clubs often discriminated against various groups based on race, creed, color, national origin or gender. Furthermore, the City also found that these clubs provided distinct business advantages to their members, that nonmembers were denied. In passing this legislation, the City Counsel found it had a “compelling interest in providing its citizens ... a fair and equal opportunity to participate in the business and professional life of the city” (id. at 216). The plaintiffs, a consortium of some 125 private clubs, contended the local law violated the home rule provisions of State Constitution, article IX, § 2 (c) and was inconsistent with the State Human Rights Law.
The Court noted that the language of the State Human Rights Law was identical to the City’s. The Court also found that the state law would meet the “comprehensive and detailed regula *849 tory scheme” required under DJL Rest. Corp. v City of New York (id. at 217). The Court found the section of the state law forbidding “invidious discrimination” against persons “set[ ] forth an extensive list of examples of facilities” that fell within the ambit of the state statute. State law and city law excluded from the definition of “public accommodation,” “any institution, club or place of accommodation which is in its nature distinctly private” (id. at 218, quoting Executive Law § 292 [9]). However, state law did not define “distinctly private.” Even though plaintiff conceded that the State had not preempted the field, it urged the Court to find the city law inconsistent with the state law. Instead, the Court upheld the local law, finding that by not specifically preempting the field “the Legislature would permit the City, consistent with both the letter and spirit of the State Human Rights Law, to regulate on its own in the face of the more particular situation it has found in its private clubs” (id. at 219). Similarly, in the instant matter, the City has a compelling interest in promoting the welfare of its citizens, in an area that it found was not adequately addressed by state law.
Clearly, all of these cases demonstrate that localities are accorded a great amount of latitude in passing local legislation to address local issues, even when the State has already legislated in those areas. Absent clear language of state preemption, not found in the instant matter, the local law will not be preempted as long as there is a rational local basis for its passage and that it does not affect statewide questions. As the court noted in Roth v Cuevas (158 Misc 2d at 245), when asked to determine the validity of term limits on New York City elected officials, “[t]he term limit legislation proposed here would affect New York City public officers only. The State has no paramount interest in term limits placed on those public officers and it is not a matter, which to a substantial degree, is a matter of State-wide concern.”
In the case at bar, the court finds that a rational, local reason exists which affects only a citywide issue, and is clearly not a matter of statewide concern. The court also finds that contrary to plaintiffs position, the areas of state and local law are not inconsistent, but complementary. The state law cites as its main reason for passage the need to eradicate the state’s notoriously difficult and hyper-technical impediments to becoming a candidate. In fact, the court notes, that at the time of the passage of the 1992 Election Reform Act, almost 50% of the election law suits in the country were brought in the State of New York. That was clearly a statewide concern.
*850 Conversely, the reasons given for the passage of the CEA. and the various local laws that followed in its footsteps were all aimed at a wholly local concern of promoting ethics in local government and reducing the real or potential influence of money on the City’s local elections. The laws are not only not inconsistent, but they actually supplement each other.
Before it addresses other issues raised by the parties, the court feels it is necessary to consider what would be the possible effect of finding that Local Law 60 and its subsequent amendments are preempted by state law. Plaintiff has limited his arguments on preemption to the positions of mayor, comptroller and public advocate, because these positions are named in the state law. However, the core of plaintiffs argument is addressed to the issue of whether the candidate has voluntarily accepted additional restrictions. Plaintiff asserts that if the candidate does not accept public funding, that he/she cannot be compelled to accept limitations other than those set by state law. Since the aforementioned offices are wholly within the geographical municipality of New York, a logical extension of plaintiffs position would be that it also applies to candidates for other clearly local municipal positions, i.e., borough president or city council.
This would clearly be prohibited by the New York State Constitution because it violates the locality’s right to control its properties, affairs, or government, and the mode of selection of its officers. However, it also raises the specter of a logistical nightmare of overlapping or contradictory filing requirements at the state and city levels. This inevitable confusion would create the exact kind of impediments to ballot access that the State Election Reform Act of 1992 was passed to prevent. It would, therefore, not only frustrate the goal of the state law, but would actually be antithetical to the state legislature’s intent, and this court is not prepared to rule against the legislature’s clear intent.
Now, the court will address several other issues raised by the parties hereto. Both plaintiff and the City exhibit conflicting positions concerning the effect of Election Law § 1-102. The AG argues against any findings, stating that they are unnecessary, given that the state law excludes any reference to publically financed elections. While the court suspects that if it were necessary for its decision to interpret the impact of Election Law § 1-102, it would find that Election Law § 1-102 means what it says it means, and must be accorded its plain meaning.
The statute governs the conduct of elections in the state and essentially holds that where an inconsistent provision of law ex *851 ists in any other law, that provision of law will apply unless the applicable provision of the Election Law has specific preemption language. However, as the court has noted above, Local Law 60 and its progeny are neither preempted by article 14 nor are inconsistent with it because article 14 simply does not address itself to locally funded publically financed elections for wholly local offices. Therefore, the impact of Election Law § 1-102 need not be resolved here. Plaintiff also argues that Administrative Code § 3-714, which essentially states that the passage of the city law is not intended to “prohibit the making or receipt of contributions to the extent permitted by the election law,” would prohibit the additional restrictions set forth in Local Law 60. Again, since this court has found that the Election Law of the state does not address itself to publically financed elections, it is without impact here.
The court also feels the need to address one other issue raised in plaintiffs reply memorandum of law. Plaintiff makes the argument that the legislature had intended, in the Election Law statute, section 479, as added by the Laws of 1974, chapter 604, predecessor to the current Election Law § 14-114, to allow high contribution levels for state and local officials. Plaintiff also argues that this level was intentionally set high to allow candidates for office to raise sufficiently large amounts of money to insure that they could fully fund their campaigns. According to plaintiff, an additional goal was the ability to raise those large amounts of contributions from a small number of donors.
Plaintiff compares the requirements of the City CEA to the state law and notes that a candidate for mayor, pursuant to the CEA, would have to raise contributions from approximately 1,300 donors as contrasted with as few as 10 non-family member contributors pursuant to the state limits to reach the $6,426,000 maximum allowable expenditure limits. Overlooking the fact that this refers to the former Election Law, which has been repealed although some of the language has been retained, the court notes, as did defendant City, that the plaintiff fails to cite “any statutory language or legislative history” to support his position. Indeed, this is clearly antithetical to the City’s goal of involving higher numbers of donors who contribute lower levels of funding in order to reduce the impact of big money interests. Actually, the court is quite shocked that plaintiff would advance this theory in light of the numerous examples of the corruptive effects of big money on politics that have been played out recently on the nightly news or the front page of the newspapers.
*852 Plaintiff inadvertently makes the best argument for the necessity of the City’s publically financed elections. From the original 1988 CFA to its most recent amendments, the reason given for the necessity of public financing is the reduction of corruption and the removal of the influence or perceived influence of wealthy special interests. As the 1988 law indicated, the “unique concentration” of wealth and financial power that exists in New York City is unlike anywhere else, and certainly is not found anywhere else in the state, and maybe not the entire country. Thus, dealing with this concentration of money is primarily a city issue, as opposed to a statewide concern.
Because the state formula was based on numbers of party enrollees or voters in city elections, it created such a high level of allowable contributions per candidate, that even the State found additional limitations were necessary. It chose to deal with this, not by changing its formula for the rest of the state, but by setting lower levels of allowable contributions for New York City offices. The city legislature found that these levels were still too high, and the sources not sufficiently limited. In response, it enacted the requisite legislation.
 Based on the foregoing, the court finds the passage of Local Law 60 of the year 2004, and Local Laws 34 and 67 of the year 2007, to be permissible exercises of local legislative authority pursuant to the State Constitution, article IX, § 2 (c). The court further finds that these local laws were properly promulgated pursuant to the grant of legislative authority to local governments to pass laws relating to the “property, affairs or government” under Municipal Home Rule Law § 10 (1) (i), and the laws relating to the “mode of selection ... of its officers” pursuant to Municipal Home Rule Law § 10 (1) (ii) (a) (1). Additionally, the court finds that public campaign financing is merely another approach to electing public officers than the one that the state legislature chose to follow. As such, the court finds the city law is not preempted by the Election Law which is silent on the issue of public financing and only addresses a system where public financing does not exist. Finally, the court finds that the establishment of uniform limitations on both participating and nonparticipating candidates is reasonably related and calculated to achieve the goals of reducing the influence of “wealthy special interests” over local elections, and increasing public participation and public confidence in those elections is well within the powers granted to the City to protect the welfare and well-being of its citizens.
*853 Therefore in accordance with the foregoing, it is hereby ordered that plaintiffs motions for a declaratory judgment and for a preliminary injunction are denied; and it is further ordered that defendant City’s cross motion to dismiss is granted.